## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| QASIM RIAZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 02 C 4596 |
| v. | ) | |
| | ) | Judge John A. Nordberg |
| | ) | |
| LYONS TOWNSHIP HIGH SCHOOL | ) | |
| DISTRICT #204, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On November 13, 2001, Qasim Riaz was fired from his job in the computer department of the Lyons Township High School District # 204 (the "District"). The District claims that Riaz had recurring performance problems over the summer and fall of 2001. Riaz asserts that his performance was adequate and that his firing was motivated by three other improper factors. First, he claims that he was fired in retaliation for a comment he made to two supervisors criticizing their decision to buy new computer server switches. Second, he believes that his firing was motivated by a bias to his religion (Muslim) and national origin (Pakistani). Third, he believes that the decision to fire him was influenced by the events of 9/11.

The district has moved for summary judgment on the three counts remaining against it: a Title VII claim (Count I); a First Amendment retaliation claim under § 1983 (Count III); and a

claim for retaliatory discharge in violation of Illinois policy (Count IV). For the reasons stated below, the motion is granted.

## FACTS[1]

On October 24, 2000, the District hired Riaz as a Network Coordinator, a position in the District's Information Technology Department. Riaz was hired based on the recommendation of Rick Swartz, who was the IT director at the time. This recommendation was passed along to Thomas Bill, the personnel director, who in turn passed it along to the Board. (Bill Dep. 10-11.)

Riaz worked for the next seven months without any performance problems insofar as we know. However, in May 2001, the District lost all the data on one of its servers due to faulty backup procedures. Jason Hines, who had just began working with the Department on a contract basis, investigated the problem and discovered that Riaz had not properly performed the required network backup procedures. As a result of Riaz's failure, the District was unable to restore the lost data.

In June, 2001, a number of changes were made to the computer department. Specifically, the District brought in Rick Rose in the newly-created position of Chief Information Officer; retained Hines on a full-time basis, giving him the title of Senior Network Administrator; changed Riaz's job title to *Junior* Network Administrator such that he now reported directly to Hines who reported to Rose; added two more work station technicians in addition to two workstation technicians already working there; added a Help Desk employee (Cynthia Logan);

---

[1]The following facts are undisputed except as where noted. In his statement of additional facts, plaintiff added 147 additional paragraphs. We have reviewed these facts and included them in our analysis subject to one caveat. We have not considered nor summarized in this opinion those factual areas (for example, plaintiff's accessing certain websites from his work computer) that were never mentioned or discussed in plaintiff's response brief.

and added two Information Support Specialists. As a result, the department increased in size, and Riaz was no longer the most senior person in charge.

After taking over, Rose and Hines instituted a number of changes. During this same time period, roughly the summer and fall of 2001, Hines discovered what he believed to be a number of performance problems with Riaz. The facts that follow largely consist in a re-telling of these various alleged incidents of poor performance.

One of the new changes was the creation of a Help Desk where computer users could report problems. Although Cynthia Logan was assigned as the primary person in charge, Rose and Hines asked Riaz if he would relieve her when she took her lunch and afternoon break. Riaz told Hines and Rose that he felt that this requirement was a major interruption in his day.

Hines eventually concluded that Riaz was late in relieving Logan at the Help Desk or entirely failed to report for duty on several occasions. Riaz disputes this charge, asserting that he was told by Rose that he should finish up urgent tasks or tasks that he was almost finished completing before reporting to the Help Desk. Hines testified that, in such cases, Riaz was supposed to call Logan and let her know he would be late. According to Hines, although Riaz claimed that he was called Logan "every time" he was going to be late, in fact he did not. Hines came to this conclusion after talking to Logan who said that Riaz had not called. (Hines Dep. 87-89.)

In the summer of 2001, Hines and Rose significantly overhauled the District's technological infrastructure by replacing six servers, adding upgraded memory and hard drives to servers, and backing up power supplies. Sometime in July or August 2001, Hines and Rose announced in a meeting that the Department planned to purchase new computer switches, costing

approximately $250,000, to alleviate a bottleneck in the network that had arisen due to increased usage. (Hines Dep. 57.)

At the conclusion of this meeting, Riaz informed Hines and Rose that he disagreed with their decision. Riaz described what he told the two men at the meeting:

> I said we did not need to replace all these switches. These switches were in good working condition. I had ordered some myself of the same kind of switches. We were using three count switches, and he wanted the Entrysis switches. Performance was not going to be improved[.] There were other bottleneck areas that have to be solved first, particularly, the wiring that's already been laid out that had to be cleaned up because the wiring was too long. [] The problem was occurring due to that, and replacing the switches would not solve the bottleneck issues and would not increase or improve as such.

(Riaz Dep. 277-78.) No one else was present at the discussion, and Riaz did not raise the issue again with anyone else in the District.

In July and August, Riaz and a group of technicians and student interns began installing software on work stations in the District's eight computer labs before the start of the school year. There is some uncertainty as to exactly what responsibility Riaz had on the project, as he attempted to suggest that he was not really in charge while Hines clearly believed that Riaz was the one responsible for setting up the labs. Yet, when asked in his deposition whether he was "primarily responsible for getting these labs up and running with the assistance of other []staff," Riaz answered:

> It wasn't my immediate responsibility, no, but *in terms of just to get that stuff done, I guess in that fashion.* But it's not my primary responsibility. I was not the one leading the – that was Jason Hines who was in charge of the whole deployment of the labs.

(Dep. 90; emphasis added.)

On August 26th, Hines discovered that the graphics lab, science lab, and eleven other work areas were not ready even though he claims that Riaz told him that they were ready. Hines blamed Riaz most of all for the failure because he was the one in charge of the project. Riaz asserts that the project was not finished because some of the computer teachers changed the list and added additional software, thus causing him to start over and install the additional software.

Eventually, the District concluded that Riaz's problems needed to be addressed. On September 5, 2001, Thomas Bill, the personnel director, held a meeting with Rose, Hines, and Riaz to discuss his performance problems. Hines read to Riaz verbatim from a list of issues that he had documented regarding Riaz's performance. Hines stated that Riaz had not installed the required software in the graphics lab, had not relieved Logan at the Help Desk, and had incorrectly reported jobs as complete. Hines expressed concern with the high number of re-opened work orders attributed to Riaz and his supervision of high school students hired as summer employees. Rose and Hines stated that Riaz was not supportive of the Department's initiatives, which was reflected by negative comments that he had made. During this meeting, Riaz stated that he did not think that Hines and Rose were doing a good job running the Department.

Within a few days of the September 5, 2001 meeting, Bill decided that Riaz should be placed on a formal remediation plan. Due to scheduling conflicts, a meeting with Riaz was not scheduled until September 20th. Bill, Hines, Rose and Riaz met on the 20th and went over the areas discussed in the September 5th meeting including Riaz's office protocol as it related to his Help Desk responsibilities; his problem-solving skills relating to setting priorities, taking initiative, managing time, multi-tasking and communicating with his supervisors; and Riaz's

human relations skills as reflected by his comments disagreeing with the Department's operational philosophy. To correct these performance problems, Riaz was placed on a remediation plan for 30 work days. Riaz was notified that he would be discharged if he failed to maintain a satisfactory level of performance.

In this meeting, Riaz offered what he describes as a point-by-point rebuttal to each of the job criticisms. When told that he had failed to set up the computer lab, Riaz explained that he installed what he was told to install. (Pl. Fact 69.) When told that he failed to relieve the help desk, Riaz explained that he was following the guidelines set by Rose, to finish urgent and almost-completed tasks first. (Pl. Fact 70.) When Hines and Rose stated that Riaz had some outstanding work orders, Riaz explained that the work had not been completed because the missing parts had not arrived. (Pl. Fact 71.)

Riaz asserts that Bill and Hines chose not to believe his explanations. (*Id.*) Riaz faults Bill for not doing any independent investigation himself. Bill, who had no experience in computer matters, stated that he relied on the statements made by two of his supervisors. In short, Bill was faced with a situation in which a supervisor said one thing and a subordinate employee said another thing. (Pl. Fact 128; Hines Dep. 61.) In his deposition, Bill was asked about how he dealt with this kind of conflict:

> Well, first of all, it was two supervisors. It was not just Hines. And in those kinds of situations, you know, based on the conversations that they had had with me prior to sitting down with [Riaz], they are his direct supervisor and that's their responsibility, to assess employee's performance. They are working with this individual on a daily basis. So, [] I have to go with the expertise of the people that have been hired to do that.

(Bill Dep. 61-62.)

On September 27th, seven days after Riaz was placed on remediation, Hines apparently felt that Riaz was still having problems. He sent Riaz an email criticizing him about various incidents and reminding him to (1) inform users when jobs had been completed; (2) inform Hines of severe problems rather than simply entering them into the database; (3) communicate better; (4) be on time for work; and (5) resolve work orders rather than forwarding them back to the Help Desk.

According to Hines, his criticisms in the September 27th email stemmed largely from two incidents, both of which Hines believed fell under Riaz's responsibility. First, on September 4th, a teacher named Jim Engling called in to the help desk reporting that a computer was not working in the graphics lab. Someone else took the call and assigned it to Riaz several days later. Riaz then went to the lab to look at the problem and concluded that "there were no problems." (Riaz Dep. 161.) Riaz testified that he told Engling in person that the computer was working. (*Id.*)

Hines tells a different story. He testified that he Riaz never informed Engling that the problem had been solved. (Hines Dep. 117.) Hines came to this conclusion after talking to Engling who stated that he had not been informed by Riaz. (*Id.* at 118.) Hines therefore concluded that Riaz was lying when he claimed that he kept Engling informed. (*Id.* at 121.) Neither side has submitted deposition testimony or an affidavit from Engling.

Second, another user (Nikita Williams) called the help desk on September 25th at around noon and stated that she was unable to send a group email letting people know that yearbook pictures needed to be taken. She told Riaz, who was working at the help desk at that time, that she needed to send the email "immediately." (Riaz Dep. 179.) Riaz logged in the request but did

not attempt to solve the problem himself because he claims that he did not have the necessary computer access rights to complete this problem. Therefore, he states that he forwarded the ticket to Hines and paged him to let him know about the problem. (*Id.* at 179-80.) Hines testified that he never received a page. (Hines Dep. 120.)

The upshot of this incident was that Williams was unable to send out the email until the next morning at which time it was too late. Williams complained to other faculty members that she could not do her job due to this problem. (Defs. Ex. G. D00087.) Hines was upset that the technology department looked like it was not doing its job. (*Id.*)

In response to Hines' email on the 27th, Riaz emailed back to him the same day and responded to each of the criticisms. For example, with regard to the criticism that he failed to inform Engling of the status of the job, Riaz wrote: "The User (Jim Engling) is **well** informed as where I stand with the issue and the outstanding issues with that lab." (Def. Ex. J; emphasis in original.) With regard to the Nikita Williams incident, Riaz wrote:

> You have a very BAD TRACK RECORD OF RETURNING CALLS, I did page[] you and you did not return my call. I have talked to you about this problem before and you simply ignore the issue and say "I was busy at that time." When you are being paged you need to reply back no matter how busy you are. Secondly I could have solve[d] the problem my self but I am afraid my "Rights" are not sufficient enough for me to do that.

(*Id.*) As for Hines' assertion that Riaz had frequently been late in the morning and then had left promptly at 4:00 p.m., Riaz stated that he was "astonished" that Hines had brought this issue because he was "always here at 7:30 am sharp," something which he claimed "all the techs can confirm." (*Id.*) Hines concluded that Riaz's reply was insubordinate in nature and that his excuses were not credible.

In late September and throughout October 2001, according to Hines, Riaz continued to exhibit poor performance in resolving work orders, working with the Help Desk, and communicating with users regarding the status of their problems.

According to Hines, when Riaz was directed to reassign IP addresses for the District's printers on October 1st, he assigned duplicate addresses to more than one printer, which caused the documents to be printed at the wrong printer. Riaz states in his deposition that he assigned the IP addresses provided to him in a list by Hines and that he therefore did not make any mistake. (Riaz Dep. 197-200.)

One user (Sharon Brophy), who erroneously received printouts from two users located at the other campus, complained that she was "very frustrated with the fact that no one has left her a [voice mail] or note informing her if the problem is resolved or still being worked on." In his deposition, Riaz stated that he did not think that Brophy's problem was related to his work on changing IP addresses even though Brophy thought that was what caused the problem. (Riaz Dep. 227.) Riaz noted that Brophy was a non-technical personal and that such people are often mistaken about what caused a particular computer problem. (*Id.*) Riaz speculated that the problem may have been due to a software glitch. (*Id.*)

Another user (Nancy O'Leary) called the help desk on October 25th and stated that Riaz had changed her printer IP address and that the printer will not stay defaulted. (Def. App. K, D00073.) Every day she had to change the default printer. (*Id.*) Another user (Mary Craggs) called the help desk on October 26th and stated to Logan that Riaz "came by this morning and worked on her machine and now her global address list is gone." (Def. App. K, D00066.) Craggs then requested that Logan "not send [Riaz] to work on her pc any more." (*Id.*) Logan

informed Hines of the problems mentioned by O'Leary and Craggs. In his deposition (at 233-35), Riaz could not remember either of these incidents.

A user in the Physical Education Department (Guido Arquilla) complained because Riaz took more than ten days to provide a registration code for software Riaz had previously installed. In his deposition, Riaz said that, while the user did complain that it had taken more than ten days to provide a registration code for the software previously installed, the problem was with the software's registration code, not with his performance, and Riaz claims that he solved the problem by getting in touch with the vendor. In his deposition, Riaz was asked why the user had stated to the Help Desk that Riaz had informed him originally that he would not need a registration code for the software. Riaz responded by stating that this was a problem of "user perception":

> Again, these users are not technically knowledgeable in terms of how a computer operates, so when these descriptions are entered, they are entered verbatim. It doesn't mean that's what the problem is. It just means that's what they think the problem is.

(Riaz Dep. 224-25.)

Riaz's remediation period ended on November 9, 2001 at which time Bill, Rose, and Hines met with him to discuss the results of the remediation. During this meeting, Hines informed Riaz that his performance had not improved. The parties discussed the lack of progress since the September 20th meeting. Riaz was given a chance to respond to the issues but stated that he would "skip his rebuttal" because be believed that based on past experience his words were given no weight or value whatsoever.

Following the meeting, Bill recommended to Superintendent Dennis Kelly that Riaz be terminated due to his failure to communicate with other members of the Department, tardiness in relieving Help Desk personnel, lack of improvement in problem solving skills, failure to accomplish assigned tasks, and failure to support the initiatives of the Department. On November 19th, the Board accepted Dr. Kelly's recommendation to terminate Riaz's employment effective November 13, 2001.

## DISCUSSION

### I.     First Amendment Retaliation Claim - Count III.

We begin with the First Amendment retaliation claim because it concerns one of the incidents upon which the District relied in determining to fire Riaz. Three steps are involved in analyzing a First Amendment retaliation claim in the public employment context:

> First, the court must determine whether the employee's speech was constitutionally protected under the *Connick-Pickering* test. Second, the plaintiff must establish that the speech was a substantial or motivating factor in the retaliatory action. Third, the defendant has an opportunity to establish that the same action would have been taken in the absence of the employee's protected speech.

*Sullivan v. Ramirez*, 360 F.3d 692, 697 (7th Cir. 2004).

The first step – whether the speech is protected under *Connick-Pickering* test – is a two-part inquiry. *Id.* First, the court must determine whether the speech "addressed a matter of public concern." *Id.* at 698. Second, assuming the first step has been met, the court must determine "whether the government's interest as an employer in providing effective and efficient services outweighs the employee's interest as a citizen in commenting upon the matter of public concern." *Id.* This two-step process is question of law for the court. *Id.*

As set out by the Supreme Court in *Connick*, to determine whether speech addresses a matter of public concern, the court must look at "the content, form, and context of [the speech], as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). It is often stated that content is the most important of the three factors, *Sullivan*, 360 F.3d at 699, and most courts begin by making an initial examination into the content of the speech, asking whether it "can fairly be said to relate to a matter of political, social, or other concern to the community." *Gustafson v. Jones*, 290 F.3d 895, 907 (7th Cir. 2002). Various issues have been considered to be "of concern" to the community. *See, e.g., Sullivan*, 360 F.3d at 700 (chronic time abuse by public employees); *Spiegla v. Hull*, 371 F.3d 928, 937 (7th Cir. 2004) ("our cases have consistently held that speech alleging government corruption and malfeasance is of public concern in its substance"); *Wainscott v. Henry*, 315 F.3d 844, 850 (7th Cir. 2003) (comment by employee to a citizen and an outside contractor that "the city administration did not know what it was doing from one day to the next"); *Gustafson*, 290 F.3d at 907 (comments about police protection and safety).

On the other hand, some topics have not qualified as a matter of public concern even under this fairly lenient initial analysis into content. The Seventh Circuit has stated that "[c]omplaints about personnel matters generally do not address a matter of public concern." *Sullivan*, 360 F.3d at 699. Also, statements about "how" tasks in an office "should be carried out" are generally not matters of public concern. *Taylor v. Carmouche*, 214 F.3d 788, 792 (7th Cir. 2000); *Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 975 (7th Cir. 2000) (police officer's statement criticizing department's decision to allow officers to only carry one pair of handcuffs instead of two was merely a complaint about "a change in equipment allocation" ).

-12-

Similarly, a government employee's speech about "ordinary matters of internal operation" is not usually held to be a matter of public concern. *Spiegla*, 371 F.3d at 936.

In general, courts have been concerned both about second-guessing personnel decisions and also about the possibility that any workplace disagreement, no matter how small, could be wrangled into a public issue. *See Berg v. Hunter*, 854 F.2d 238, 242 (7th Cir. 1988) ("If every facet of internal operations within a governmental agency were of public concern, and therefore any employee [] comment upon such matters constitutionally protected, no escape from judicial oversight of every government activity down to the smallest minutia would be possible."); *see also Connick*, 461 U.S. at 147 (noting that a federal court generally is "not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency").

Riaz believes that his comment criticizing the purchase of $250,000 worth of computer switches is speech on a matter of public concern because he was speaking out about "what he believed to be a misappropriation of public funds." (Resp. At 10.) Contrary to Riaz's characterization, his speech related less to misappropriation of funds and was more a dispute over "how" a task in the office should be carried out in the office. Accordingly, it does not qualify as a matter of public concern. *See, e.g, Taylor*, 214 F.3d at 792; *Kuchenreuther*, 221 F.3d at 975; *Spiegla*, 371 F.3d at 936.

This conclusion is supported by the recent case of *Carreon v. Ill. Dept. Of Human Services*, 395 F.3d 786 (7th Cir. 2005), where the Seventh Circuit affirmed summary judgment against seven plaintiffs working in a nursing home. One of the plaintiffs, Agnes Hayes, claimed that she was fired because, among other things, she reported to the director of nursing that her supervisor was doing personal work on the clock and she advised the hospital administrator that

the Center "was wasting its money by purchasing lab coats embroidered with the names of ex-employees." *Id.* at 794. The Seventh Circuit held that neither of these comments touched upon a matter of public concern even though they arguably implicated the misuse of public funds:

> Hayes's reports about the lab coats and her supervisor's abuse of time might constitute protected speech under certain circumstances because they implicate the misuse of public funds. *See Propst v. Blitzer,* 39 F.3d 148, 152 (7th Cir. 1994). But plaintiff does not describe her supervisor's behavior as so pervasive that it would substantially impact the public fisc, and did not report the practice to anyone outside the Madden Center. *See Metzger v. DaRosa,* 367 F.3d 699, 702 (7th Cir. 2004). Nor has Hayes alleged that the lab coat vendor was intentionally defrauding the hospital. Again, plaintiff reported this problem only internally. Under the circumstances, these complaints do not touch upon matters of public concern.

*Id.*

This rationale leads to the same result here. Riaz did not speak about any "pervasive" problem but instead made a single comment about one decision relating to a technical computer question; he did not report the issue to anyone other than the two supervisors who allegedly were misappropriating the funds; and he has never alleged that anyone was intentionally profiting from the alleged misappropriation such as a favored vendor. In fact, in his response brief, Riaz describes this dispute between him and his supervisors as one about whether buying the switches would be "efficient" and "useful." This description suggests that the dispute was not about an intentional misappropriation of funds but was a judgment-call about which method of addressing the problem was the best one.[2] For all these reasons, we grant judgment to the District on the First Amendment retaliation claim.

---

[2]It should be noted that Riaz has admitted that both Hines and Rose had more computer experience than he did.

## II.    Title VII Claim – Count I.

In its opening brief, the District argued that Riaz has no direct evidence of discrimination and therefore must proceed under the indirect burden-shifting method set forth in *McDonnell-Douglas*. In his response brief, Riaz did not challenge this assertion, and therefore we will consider his claim only under the indirect method.

The District argues that Riaz cannot succeed under this method for two primary reasons. First, Riaz cannot demonstrate a prima facie case because there are no other similarly situated non-Pakistani Muslims who engaged in similar conduct. Second, Riaz has not come forth with any evidence to suggest that the District's stated reasons for firing him were pretextual. We agree with both arguments and grant summary judgment to the District on this claim.

### A.    Similarly Situated Individuals.

Plaintiff bears the burden of establishing that he was similarly situated to the allegedly comparable employees. *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 546 (7th Cir. 2002). To meet this burden, plaintiff must show that the other employees are "directly comparable to him in all material respects." *Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002). When a plaintiff claims that he was disciplined more stringently than another employee, the plaintiff must show that he is similarly situated to this other employee "with respect to performance, qualifications, and conduct." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). We are mindful, however, that the plaintiff and the other employee need not have "committed exactly the same infraction" or have engaged in "identical" conduct – just similar conduct. *Ezell v. Potter*, 400 F.3d 1041, 2005 WL 602958, *8 (7th Cir. Mar. 16, 2005).

Applying this three-part guideline here, we find that plaintiff has not established a genuine issue of material fact on this element. One reason is that plaintiff has failed to develop the facts necessary to support his assertions. Plaintiff argues on a general level that he is comparable to the other four computer technicians, but he has not provided any direct evidence as to what performance problems these employees allegedly had. He has not submitted any deposition testimony from them, nor any evidence from the District about their performance history. Instead, plaintiff relies almost exclusively on his own conclusions even though he was not in a position to know how these other employees were treated. In short, we cannot even make a meaningful comparison. *See Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 940 (7th Cir. 2003) (rejecting plaintiff's claim that employees engaged in comparable conduct because, among other things, plaintiff presented "no evidence, affidavits, or deposition testimony" from these employees and instead relied on her own "conclusory assertions about incidents outside her personal knowledge").

In any event, it is clear that plaintiff was not comparable to the four technicians. Although they had the same supervisor as he did, they had different jobs, different employment histories, and different performance histories.

By plaintiff's own admission, he had a higher-level and different job (Junior Network Administrator) than did the four work-station technicians. *See Ajayi v. Aramark Business Services, Inc.*, 336 F.3d 520, 532 (7th Cir. 2003) (two individuals were not comparable because they "never held the same job description"). In fact, plaintiff *supervised* two of these four technicians during the time period before Hines and Rose were hired. In his response brief,

plaintiff concedes that he had "more responsibilities and duties" than these other employees. (Resp. at 8.)

Plaintiff also concedes that he was more skilled than the technicians, partly because he was more familiar with the school's system, and that he could complete projects that at least some of the other technicians were unable to complete. (Pl. Facts 33-34.) When asked where he fit in the group in terms of skill level, Riaz said that he was "on top." (Dep. 50.)

Although plaintiff and these four employees on occasion did perform some of the same jobs, such as covering the help desk, they had different areas of responsibility. Riaz was responsible for network server problems whereas the work-station technicians focused on computer troubleshooting and user problems. (Pl. Fact 8.)

With regard to performance, as noted above, we lack information to make a meaningful comparison. From what we do know, however, plaintiff has not established that any one of these technicians had a similar performance history.

Plaintiff points to only two incidents in which any of the other four technicians were even arguably involved. First, he argues that the technicians were also involved in the failure to set up the computer lab. Hines explained, however, that he blamed plaintiff the most because he was in charge. Although plaintiff quibbled over this point in his deposition, trying at various points to suggest that the project was a collaborative team effort with no one in charge, he basically conceded in the deposition testimony that we quoted in the fact section above that he was the one in charge after Hines.[3]

---

[3]This fits with the other evidence. If plaintiff was more experienced and capable than these other employees, as he claims, it would be surprising that he would not be in charge.

Second, plaintiff complains that some of the technicians were also late in showing up to relieve Logan at the Help Desk. Again, plaintiff has simply failed to develop the facts about which particular employees (was it even a work station technician?) failed to show up, how often, and what if any punishment was handed out. Even accepting plaintiff's contention regarding these two incidents, however, these technicians are not comparable because it is undisputed that the District fired plaintiff based on many more incidents than just these two. Accordingly, plaintiff has failed to establish a *prima facie* case.

### B. Pretext.

Even if he had, we still would grant summary judgment because plaintiff has not established a genuine issue of material fact on the question of pretext. The law regarding pretext is well-settled. Without any direct evidence of pretext, which is the case here, the plaintiff must submit evidence "which would tend to prove [that the District's] proffered reason was factually baseless, not the actual motivation for the discharge, or insufficient to motivate the discharge." *Dyrek v. Garvey*, 334 F.3d 590, 598 (7th Cir. 2003). The fact that the decision may have been "mistaken, ill considered, or foolish" is not enough to meet this burden. *Id.*; *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 561 (7th Cir. 2004) ("Pretext is more than a mistake on the part of the employer; it is a phony excuse.").

Plaintiff offers three primary arguments. (Resp. at 3-7.) First, he asserts that, because his contract was renewed on July 1, 2001, the District was actually satisfied with his performance. Second, plaintiff argues that the District failed to timely inform him that his performance was inadequate and failed to conduct a thorough and independent investigation into the charges made against him. Third, plaintiff asserts that there is a fact dispute as to whether his performance was

adequate because he has offered various explanations and rebuttals to the charges made by Hines. As set forth below, none of these arguments casts doubt on the honesty of the District's stated reason for firing plaintiff.

**Contract Renewal.** Plaintiff's first argument is based on these facts, which are taken verbatim from his statement of additional material facts:

> Riaz's contract was renewed for another year, beginning on July 1, 2001. Riaz[] also received a pay raise to $51,000 a year. Since Riaz was not part of the bargaining unit, his salary increase was based on performance information provided to the Superintendent by Riaz's managers and administrators.

(Pl. Facts 58-59; citations omitted). Plaintiff believes that these facts cast doubt on the District's explanation because they show that the District was in fact satisfied with his performance.

This argument carries no weight because it is undeveloped and because the contract renewal occurred before the key events in question. The argument is undeveloped because plaintiff has failed to establish the necessary predicate facts to even know what really happened. Plaintiff has offered no testimony from anyone with knowledge of how this process was carried out, what standards were used to grant such raises, and what people provided input to the Superintendent. Importantly, there is no evidence that either Hines, Rose, or Bill – the ones involved in making the later decision to fire him – provided *any* input to the Superintendent regarding the issue of this pay raise. The fact that *another supervisor* (most likely Swartz) may have thought Riaz was performing adequately is not relevant.

In any event, the timing is off. All of the incidents that the District relied on in its decision to fire plaintiff, with the exception of the May 2001 server incident, took place *after* July 1st. Therefore, even if the District considered Riaz's performance adequate on July 1st,

-19-

things changed thereafter. It is undisputed that the District fired plaintiff based on a series of ongoing problems that occurred over time and after counseling.

**Procedure.** Plaintiff argues that the District failed to adequately investigate the charges against him and also failed to inform him that he was not performing adequately. These arguments also carry no weight under the undisputed facts of this case.

Plaintiff's argument that the District failed to keep him informed is not persuasive because the District in fact did inform plaintiff repeatedly that his performance was inadequate. As documented in the fact section above, the District discussed these problems with him in multiple meetings, in statements made in person, and in emails. The fact that Hines may not have talked to plaintiff the same day that he observed or learned about a performance deficiency does not create any negative inference because there is no legal requirement that the District must contemporaneously inform employees of problems. Nor is there any internal District policy imposing such a requirement.

Plaintiff also complains that his firing was largely based on the "subjective perceptions" of Hines. It is not clear exactly what this phrase means as all eyewitness testimony could be labeled a subjective perception. To the extent that plaintiff is suggesting that Hines did not have any independent evidence, he is wrong as factual matter. As summarized above, under the undisputed facts, it is clear that Hines took steps to confirm at least some of the allegations. For example, Hines concluded that Riaz failed to call in to the Help Desk when he was late only after talking to Logan. Likewise, Hines concluded that Riaz failed to keep Engling informed about the computer problem only after talking to Engling. With regard to the Nikita Williams incident, Riaz told Hines that he paged him; Hines observed that he had never received a page. With

-20-

regard to Riaz's work changing IP addresses, Hines received information from various users who called in to the Help Desk to say that problems still existed after Riaz supposedly had fixed the problem. In short, Hines' conclusion was not based solely on his own perceptions.

In any event, a supervisor may decide to fire an employee based on his or her perceptions and intuitions even if they are deemed "subjective." An employer also may choose – for a variety of reasons including time pressures and budget constraints – to conduct something less than a full-blown investigation. This does not by itself create an adverse inference especially if there is no evidence that the employer varied from a pre-established decisionmaking process for this one employee.

In particular, plaintiff focuses heavily on the fact that Bill, the person who made the decision to fire him, did not independently investigate the allegations but simply relied on Hines because he was a supervisor. Again, this argument misconceives the pretext standard by wrongly assuming that Bill was required to conduct an independent investigation. He is not. *See, e.g., Balderston v. Fairbanks Morse Engine*, 328 F.3d 309, 324 (7th Cir. 2003) ("Even if [the supervisor] *did not check on the validity of all of his facts and had a mistaken belief*, as with the erroneous budget figures, there has been no showing the dismissal was based on illegal discrimination.") (emphasis added). Therefore, if Bill decided to fire plaintiff because Hines was a supervisor, this is a valid reason and not discriminatory on its face.

**Plaintiff's performance.** Plaintiff's primary argument is that a dispute exists in this case about whether his performance was adequate and that summary judgment therefore cannot be granted. Plaintiff's claim that a dispute exists rests almost exclusively on his own interpretation of events. Plaintiff's own belief that he was performing adequately is not sufficient to survive

-21-

summary judgment as the Seventh Circuit has repeatedly noted. *See, e.g., Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001) ("An *employee's* perception of his own performance [] cannot tell a reasonable factfinder something about what the *employer* believed about the employee's abilities.") (emphasis in original); *Balderston*, 328 F.3d at 323 (plaintiff's "own belief . . . is irrelevant to the question of pretext").

In our fact section above, we have attempted to include all of plaintiff's many explanations and rebuttals to the charges made against them.[4] In reviewing those facts, it is clear that plaintiff's case rests on his own belief that he did nothing wrong. For the most part, he argues that others misunderstood what he had done. For example, the users were unsophisticated and therefore were wrong when they told Hines that Riaz had failed to do the work he was asked to do. Hines and Rose wrongly believed that he had responsibility for the computer project when he believed that he did not.

The major problem with plaintiff's entire argument is that he has offered no corroboration of his perceptions and beliefs. For example, he claimed that the work station technicians could easily confirm that he had never been late. Yet, he has not offered any evidence from those technicians to back up this point. Take the Help Desk issue. Plaintiff says he did call Logan when he was late. Hines disputes that assertion based on Logan's comment. The same scenario played out with the Engling incident. Notably, plaintiff has not offered any testimony from either Logan or Engling to establish that Hines' description of what they said was wrong or that it was somehow obvious that Hines should not believe these two employees.

---

[4]It should be noted that plaintiff has not offered *any* rebuttal to a few of the charges – *e.g.* the May 2001 failure to back-up the servers; the incident with Craggs; and the incident with O'Leary.

As is set forth above in the fact section, in most cases, Hines either personally inspected work Riaz had done or relied on statements made by other employees who Hines had no reason to believe were lying. For example, with regard to the IP addresses, several users complained about Riaz's work. One of them even went so far to say that she did not want to work with Riaz again. This information, coming from numerous employees, is clearly a factual basis to support Hines' belief.

Even if Riaz could create some kind of suspicion regarding Hines' testimony, which he has not done, he would still have to show that Bill's decision to believe Hines was itself baseless or an intentional lie. However, Bill testified that, after carefully listening to both sides of the story, he believed what Hines and Rose were telling him instead of Riaz. Nothing in the record suggests that he did anything other than make a good faith decision to resolve this conflict. There is no evidence in the record whatsoever to suggest that Bill harbored any bias against Riaz. In fact, Bill was involved in the initial decision to recommend hiring Riaz in 2000. Although Bill did not do any independent investigation, he did weigh the issues. For example, with regard to Riaz's assertion that Hines had a bad track record of returning calls, Bill did not believe Riaz on this point because he had observed that Hines had always returned his calls.

In sum, after carefully reviewing the record in a light favorable to plaintiff, there is no evidence from which a jury could believe that Bill did anything other than make a good faith decision based on the facts before him. Because plaintiff cannot establish a genuine issue of fact on the question of pretext, we would grant summary judgment on this ground even if plaintiff had established a prima facie case.

### III.  Claim For Retaliatory Discharge In Violation Of Illinois Public Policy – Count IV.

The District argues that summary judgment should be granted on Riaz's state law retaliatory discharge claim (Count IV) because the District is immune under the Tort Immunity Act and because Riaz was not terminated in violation of a recognized public policy exception to the doctrine of at-will employment.  We agree with the arguments set forth by the District in its opening and reply briefs and grant summary judgment on this Count to the District.

### CONCLUSION

For the reasons set forth above, the District's motion for summary judgment is granted and judgment is granted to the District on Counts I, III, and IV.  The remaining Count II concerns the individual defendants in this case.  In the District's motion for summary judgment (at footnote 1), it argued that the individual defendants were not timely served so that Count II should be dismissed.  In order to determine what action should be taken by the Court, the parties are ordered to appear on June 2, 2005 at 2:30 p.m. for a hearing on this matter.

ENTER: *May 20, 2005*

JOHN A. NORDBERG
Senior United States District Court Judge

-24-